U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed March 04, 2011**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| EQK BRIDGEVIEW PLAZA, INC., | § | CASE NO. 10-37054-SGJ-11 |
| DEBTOR. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF:
(A) ORDER DENYING DEBTOR'S MOTION TO EXCHANGE 12.0717 ACRES
OF EAGLE CREST PROPERTY WITH 2.961 ACRES OWNED BY
FARMERS BRANCH LOCAL GOVERNMENT CORPORATION
PURSUANT TO 11 U.S.C. § 363 [DE # 78]; AND (B) ORDER DENYING
MOTION FOR RELIEF FROM AUTOMATIC STAY OF BANK OF AMERICA, N.A.,
CONDITIONAL ON CERTAIN ADDITIONAL ADEQUATE PROTECTION BEING
PROVIDED TO IT, AND OTHER RELIEF [DE # 62]**

CAME ON FOR CONSIDERATION by the court the Debtor's Motion to Exchange or Sell [DE # 78] (the "Section 363 Motion") and the Motion of Noteholder [Bank of America, N.A.] for Relief from the Automatic Stay [DE 62] (the "Motion to Lift Stay"). The above-referenced Chapter 11 debtor, EQK Bridgeview Plaza, Inc., will henceforth be referred to as the "Debtor." The noteholder/movant on the Motion to Lift Stay will henceforth be referred to as "BOA." The court heard combined evidence on the Section 363 Motion and the Motion to Lift Stay over a three-day period, on

January 13, 2011; February 11, 2011 and February 25, 2011. The court heard nine live witnesses and considered dozens of documents. The following are the court's findings of fact and conclusions of law. Where appropriate, a finding of fact shall be construed as a conclusion of law, and *vice versa*. The court has jurisdiction over these contested matters, pursuant to 28 U.S.C. § 1334, and these are a core proceedings, pursuant to 28 U.S.C. § 157(b). The governing statutory authority is at least Section 362 and 363 of the Bankruptcy Code. The court reserves the right to supplement or amend these findings of fact and conclusions of law.

**FINDINGS OF FACT**

1. The Debtor filed its voluntary Chapter 11 bankruptcy case on October 4, 2010. The Debtor represents that it now owns four separate pieces of real property, which the Debtor's Schedules value, collectively, at $74,312,000: (a) Windmill Farms (which is approximately 2,928 acres of undeveloped land in Forney, Texas), which property was allegedly acquired by the Debtor from a related entity called "EQK Windmill Farms, LLC" shortly before filing bankruptcy; (b) Dunes Plaza Property (which is a shopping center in Michigan City, Indiana), which property was also allegedly acquired by the Debtor shortly before filing bankruptcy from a related entity called South Cochran Corporation; (c) Bridgeview Plaza Property (which is a shopping

center in LaCrosse, Wisconsin), which property the Debtor has owned for several years; and (d) Eagle Crest Property (which is an office building, and the site of a former warehouse and approximately 12 acres in Farmers Branch, Texas), which property the Debtor allegedly acquired from a related entity called Transcontinental Brewery, Inc., n/k/a 1925 Valley View, Inc., shortly before filing bankruptcy.

2.    As noted, three of the four real properties listed in the Debtor's Schedules were allegedly transferred **to the Debtor** from other related entities just days before the Chapter 11 filing. The Debtor has not concealed these facts at all, but, rather, has taken the position that there was a **valid business purpose** for the transfers—that being to both save costs and streamline the process with respect to the Chapter 11 filing (*i.e.,* by having one case instead of four), and, also, to enhance the reorganization prospects of certain properties that have minimal or no equity, by essentially pooling such assets with properties that **do** have equity. For example, the Windmill Farms property is believed to have substantial equity (perhaps $30 million, by the Debtor's estimate), but is as-yet undeveloped and yields no cash flow. The Debtor's strategy for the case—though not fully presented in a plan yet—has been articulated as one aimed at maximizing recoveries to all through the pooling of these four real property assets.

3.    In any event, it is the Eagle Crest Property in Farmers Branch, Texas which is now the subject of the two pending motions.  BOA, acting through a servicer, Midland Loan Services, asserts a claim of $2,437,575.98 owing to it on the petition date, which claim is secured by the Eagle Crest Property—although, as alluded to, a different entity than the Debtor was actually the borrower on the BOA loan (*i.e.,* Transcontinental Brewery, Inc.).[1]  The Debtor does not concede this exact claim amount asserted by BOA—the Debtor thinks it might be slightly overstated.  The Debtor scheduled the BOA claim at $2,381,336.03 in its Schedules.  In any event, BOA has filed its Motion to Lift Stay, arguing multiple "causes" pursuant to Section 362(d) of the Bankruptcy Code, that justify relief from the stay.  Among other things, BOA asserts there is no equity in the Eagle Crest Property and it is not necessary to an effective reorganization.  BOA has put forth evidence that the Eagle Crest Property is worth **$2,195,000**.  The Debtor's own appraisal shows it is worth slightly more, at **$2,370,000**.  Thus, the Debtor concedes there is no equity on the Eagle Crest Property—but thinks there is just ***barely*** no equity.  On the topic of whether the Eagle Crest Property is necessary to an effective reorganization, it is somewhat noteworthy that the Eagle Crest

---

[1]  The Debtor takes the position that it not only acquired the Eagle Crest Property but assumed the BOA debt thereon and other debt associated therewith.

Property has not had any non-insider tenants for several years (it had three to five tenants when the BOA loan was made in October 2006). Currently, only an insider of the Debtor leases the Eagle Crest Property for *storage* purposes–paying the Debtor approximately $25,000 per month of rent. Specifically, the insider to which the court is referring is an entity known as Prime Income Asset Management ("hereinafter, "Prime")—which is the entity that manages the properties of the Debtor and also provides consulting to the Debtor and also happens to be the guarantor of BOA's claim relating to the Eagle Crest Property. There is also a new tenant, of sorts, that apparently paid $6,000 postpetition to store some trailers at the back of the Eagle Crest Property. In any event, the Debtor believes that the Eagle Crest Property is necessary to an effective reorganization because it is producing a fair amount of cash flow and could, perhaps, be marketed for sale or be the subject of a refinancing. The credible evidence is that the Eagle Crest Property is of 1970's vintage, is in "fair" condition, and any potential buyer or lessee would need to come in and do substantial work to make it genuinely usable and attractive.

4. In addition, BOA has argued that there is further "cause" to lift the stay, because the Debtor has acted in "bad faith" in various ways. For example, with respect to the transfer of the Eagle Crest Property to the Debtor on the eve of

the bankruptcy, BOA argues this can reasonably be inferred to have been done for the purposes of thwarting BOA and perhaps other creditors.  Also, as further bad faith, the Debtor demolished a more-than-100,000 square foot warehouse on the Eagle Crest Property (that was behind and attached to the office building thereon) without notice to or consent of BOA, which BOA believes impaired the overall value of the Eagle Crest Property. The evidence was that a Debtor representative had asked permission of BOA to demolish this building prepetition and had obtained a permit well before it was demolished, but BOA never consented.  The Debtor also put a lien on the property without BOA's knowledge or consent, when it borrowed money to pay outstanding property taxes.

5.    In addition to these alleged indicia of "bad faith," BOA also argues further "cause" to lift the stay is lack of adequate protection.  BOA has not received a contractual note payment on the Eagle Crest Property since May 2010 and is now only receiving approximately $8,500 per month of cash adequate protection payments.  Additionally, BOA's representative (Bryan Turner) credibly testified credibly that the Eagle Crest Property is decaying and is not being well-maintained (certain pictures seemed to corroborate that).  BOA wants the stay lifted to proceed with its state law remedies on the property, including foreclosure.

6.    The Debtor has undertaken a somewhat novel and

-6-

interesting strategy in this case *vis-a-vis* the Eagle Crest Property.  Specifically, the Debtor has sought permission to essentially carve-off and **swap** roughly 12 acres of land on the back-portion of the Eagle Crest Property in exchange for certain **other** land down the street in Farmers Branch, Texas (which "other" land is not currently property of the estate).  The court will refer to the approximately 12 acres of land in back of the Eagle Crest Property as the **"surplus land."**  The court will refer to the "other" land down the street as the **"proposed swap land."** **The proposed swap land is roughly 2.961 acres.**

    7.    The exact details are that the **City of Farmers Branch—in whose municipality both the surplus land and proposed swap land are situated—**desires to acquire the **surplus land** (for a place to perform maintenance on city-owned vehicles), and it is proposed that the City of Farmers Branch would take a conveyance of title on the **surplus land** and the City would, in turn, convey title to the Debtor of the **proposed swap land**—which the City happens to own and does not want or need.  There would be no cash involved at all:  simply a land-for-land title swap.  The Debtor believes that the proposed swap land has much greater value than the surplus land.  The Debtor represents that, if this court permits the swap, it would begin marketing both the remaining front part of the Eagle Crest Property (for sale or lease; it is actually already marketing it), and would also market the

-7-

proposed swap land and explore refinancing alternatives on both of these properties as well.  Meanwhile, the Debtor believes that its insider-tenant, Prime, would remain at the building on the Eagle Crest Property, pending marketing efforts, continuing to pay approximately $25,000 per month.  If this swap transaction is approved, the Debtor believes it would be converting BOA from a very slightly undersecured position to a ***comfortably oversecured*** position.

8.    But BOA has a wildly different view of the bona fides of the proposed swap transaction.  In fact, this court has a difficult time remembering when a Debtor and a secured creditor (and their respective experts) have ***ever*** had such wildly different views about the value and risks associated with a single piece of real property.  First of all, both the surplus land and the proposed swap land are on the same street, Valley View Lane, and are about one mile apart.  The proposed swap land is west of the Eagle Crest Property and is right next to a major thoroughfare—specifically the President George Bush Turnpike. But, notably, the 2.961 acres of proposed swap land is situated immediately next to what was formerly, between roughly 1978-1980, ***an approximately 20-acre city landfill*** owned by the City of Farmers Branch (*i.e.,* a municipal solid waste disposal site).  As an aside, the proposed land swap described is actually part of a bigger land swap.  Specifically, the bigger related swap is that

the City of Farmers Branch would also be swapping the 20-acre former city landfill to the entity known as Prime, that was earlier described, and Prime would swap to the City of Farmers Branch approximately two acres of aggregate land that *Prime* owns elsewhere within the City of Farmers Branch.  From the evidence, the court perceives that the Debtor's proposed land swap with respect to the Eagle Crest Property is really just a small piece of a much larger puzzle being put together, primarily by Prime. To be clear, Prime would be receiving a much bigger piece of land in its own land swap with the City of Farmers Branch and, meanwhile, another party which may be closely connected—R.L. Lemke—happens to own and is currently pursuing deals on certain *other* real property directly across Valley View Lane from the proposed swap land.  While the Debtor seems to be genuinely convinced that the proposed land swap with respect to the Eagle Crest Property is good for the Debtor and also good for BOA, without a doubt, the related-party Prime must think it is an overall good deal for *it, too,* if all of these pieces to the puzzle fall into place—giving it and friendly parties a big footprint of land down Valley View Lane adjacent to the President George Bush Turnpike.

9.   In any event, BOA believes the value and risk-factors associated with the proposed swap property are *much less favorable* than simply retaining the Eagle Crest Property as a

whole. BOA is concerned about the environmental risks associated with the Debtor acquiring land immediately next to a former landfill. To be clear, the proposed swap land was not *itself* a landfill but, not only is it immediately *adjacent* to the former landfill, but the proposed swap land served as a Citizens Collection Center, at which citizens could bring their solid waste to be disposed at the landfill. The proposed swap land has a concrete parking lot and contains a very small building on it. At this juncture, only Phase I environmental studies or screenings have been undertaken on the proposed swap land—one by an expert hired by the Debtor (J. Crawford) and one by an expert hired by BOA (Mark Hemingway). This is one instance of the wildly different views to which the court earlier referred. The Debtor's environmental expert testified rather adamantly that the Phase I study that he did showed absolutely *no* recognized environmental condition or issues with respect to the proposed swap property and he saw no need for a Phase II environmental study. He relied, it seemed, heavily on the fact that the former landfill was closed by the City of Farmers Branch under the appropriate supervision of State of Texas officials (TCEQ).

10. BOA's expert, Mr. Hemingway, frankly, testified in a far more credible, knowledgeable, and thorough manner. Mr. Hemingway appears to have a vast amount of expertise and experience with environmental testing of property and ground

water, including testing at former landfills. He stated very
credibly that a Phase II environmental study should be done by
any interested purchaser or financer with regard to the proposed
swap property—and that he thought there was a possibility of
environmental conditions. While it is true that the adjacent 20-
acre former landfill site was only a landfill for a short time
(1978-1980), and it has been closed for approximately 30 years
with no incidents or contamination being discovered, the fact is
that: (a) the standards for landfills and landfill closures were
more lax in the 1970's; (b) there is certain evidence indicating
that certain waste may have only been recently removed from the
landfill in 2007; and (c) several methane ventilation stacks are
erected on the adjacent landfill site and are not just an
eyesore, to some extent (the court uses this term based on its
own viewing of the pictures submitted into evidence), but the
methane stacks certainly suggest that there **has been or is still**
a need to ventilate methane from the adjacent former landfill.
Mr. Hemingway credibly testified that every prior landfill at
which he has ever performed groundwater tests has, indeed,
involved groundwater contamination. Mr. Hemingway further
credibly testified that, not only is there the possibility that,
if groundwater contamination exists at the former Farmers Branch
landfill, that it could be migrating to the proposed swap land
(and he does not know and one cannot know for sure what direction

-11-

groundwater might be migrating), but Mr. Hemingway also credibly testified that there is likely a need for doing Phase II environmental testing at the proposed swap land due to **other** nearby property owners (such as Exide and McDonald Technologies) that have some history of state or federal environmental violations.

11.    Another place where the Debtor and BOA have wildly differing views is on land value—irrespective of environmental risks.  The Debtor's appraisal expert (Brian Humphries), based on comparables, values the whole Eagle Crest Property at *$2.93* per square foot or *$2,370,000*.  The Debtor's appraiser also believes that, if you carved up the Eagle Crest Property, the surplus land standing alone would have $770,000 of value (and would not be marketable to anyone but surrounding property owners because of access-issues), and that the Eagle Crest office building and excess land (not including the back-12 acres) marketed alone would have a value of approximately $1,385,000.  Meanwhile, the Debtor's appraiser values the proposed swap land at *$1,620,000*, based on a comparable sales methodology.  The Debtor's expert sees the proposed swap land as appealing because it can be developed for many different usages (almost anything but residential use) and he thinks the likely use for the proposed swap land would be for *retail*.  The Debtor's appraiser thinks the proposed swap land is much more marketable than the Eagle Crest

Property and its market value is *$12.60* per square foot. He thinks the proposed swap land could be sold in nine to twelve months, but probably more likely in 18 months to two years. The Debtor's appraiser does not believe the marketing of the proposed swap land would be affected by its prior use as a citizens collection center for waste, or by the adjacent former landfill, or by certain restrictions imposed in a draft asset purchase agreement with the City of Farmers Branch (which restrictions contemplate development of the property within 20 years, or the City can repurchase the property free and clear of interests, at its tax appraised value). The bottom line is, the Debtor's appraiser thinks the land swap would result in BOA going from having *$2,370,000* worth of collateral to *$3,010,000* worth of collateral. The Debtor's appraiser did not think any environmental risks were real—the Phase I study having shown nothing problematic—and noting that Victory Place in Downtown Dallas was built on a former landfill.

12. The court found BOA's appraiser (Julius Blatt of CB Richard Ellis) to be more convincing than the Debtor's appraiser. He testified that a rate of $2.71 per square foot was more appropriate for valuing the whole Eagle Crest Property—and this yields a value of *$2,195,000*. One difference between the Debtor's and BOA's appraisals is that BOA's appraiser considered the demolition of the 100,000 square foot former warehouse behind

the Eagle Crest Office building and the Debtor's appraiser did
not. The court agrees with BOA's appraiser that this is a factor
of some relevance. Moreover, the Debtor's appraiser seemed to
give the remaining office building more intrinsic value than
BOA's appraiser did. The court, based on the credible evidence
of these appraisers, as well as the testimony of Bryan Turner,
thinks it is more credible that the office building has little
value to a prospective buyer–given its state of decay and age,
and the fact that only an insider (Prime) has been interested in
using the building in recent years–and Prime only uses it for
storage (not the building's original purpose). The court
believes Mr. Blatt, who testified that the Eagle Crest Property
should be valued for its land at this point, and its highest and
best use for any buyer would be to raze the office building at
this juncture. Frankly, the court does not agree with the
statement of the Debtor's witnesses that the office building on
the Eagle Crest Property is not an "eyesore." From the pictures
submitted, it looks like a building that no one would be terribly
interested in, at this juncture. So the court accepts Mr.
Blatt's valuation for the Eagle Crest Property as a whole of
***$2,195,000***, as the more credible valuation. The court notes that
Mr. Blatt, when subdividing the Eagle Crest Property, came up
with an $840,000 value for the 12 acres of surplus land behind
the office building (versus the $770,000 value for the surplus

land derived by Mr. Humphries), and Mr. Blatt derived a value of $920,000 for the Eagle Crest Property without the 12 acres of surplus land. The court has difficulty choosing which valuation methodology (that of Mr. Blatt or that of Mr. Humphries) makes more sense when subdividing the Eagle Crest Property (when the Eagle Crest Property is already a somewhat odd z-shaped property). The reality is that the sum of its parts is clearly not worth as much as the Eagle Crest Property, as a whole. So really, the bona fides of the swap transaction mostly boil down to how valuable the *proposed swap land* might really be.

13. With respect to the proposed swap land, the court also believes Mr. Blatt that *light industrial or warehouse use* is more likely for its future use than *retail usage*. Mr. Blatt values the property at *$440,000*, which is using *$3.41* per square foot—and this is *hugely* lower than Mr. Humphries' *$1,625,000* value at *$12.60* per square foot. The credible testimony on this point was that less than 1,000 people live within a one-mile radius of the proposed swap land (something like 214 households). Other things that Mr. Blatt thinks make the proposed swap land less desirable for retail purposes (beside the low, nearby residential population) is that there is other available land that is nearby for retail (that does not happen to be adjacent to a former landfill with visible methane stacks) and also the fact that the property is not visible from the nearby President George

-15-

Bush Turnpike.  It is not at all clear that the proposed swap
land would be visible, even with large signage—if zoning would
permit such signage (which was not in evidence).  So there is:
(a) low residential population nearby; (b) less-than-favorable
visibility; and (c) plenty of available nearby land that one
could purchase for a retail development.  The biggest reason for
Mr. Blatt's lower valuation than Mr. Humphries', with respect to
the proposed swap land, is the fact that Mr. Blatt believes it
has a most likely future industrial or warehouse type use, while
Mr. Humphries believes the land is more appropriate for retail.

14.  One more noteworthy aspect of the proposed swap land is
that it is in a flood plane.  Also noteworthy, in the court's
view, is the fact that Dallas County Appraisal District has
appraised the property at *$516,000* or *$4.01* per square foot.

15.  The court believes the evidence is compelling that the
proposed swap land is just not as valuable and full of potential
as the Debtor's representatives optimistically suggest.  While it
sounds good to say it is near the busy President George Bush
Turnpike, it is, frankly, in a still-largely undeveloped stretch
of that turnpike, and is not really visible from the Turnpike.
And, again, it happens to sit next to a former landfill where
there are exposed methane stacks.  Meanwhile, there is an
abundance of available property nearby—in other words, the
supply/demand equation is just not slanted in the Debtor's favor,

in addition to everything else.  There was even credible
testimony that there are plots of land nearby that are in the
City of Carrollton, Texas, versus the City Farmers Branch,
Texas-the former of which is zoned for selling alcoholic
beverages (unlike Farmers Branch).  This obviously gives an added
marketing advantage to those property owners that have Carrollton
lots for sale or lease.  There was also credible evidence that
the retail strip center closest to the proposed swap land is
largely unoccupied and has closed restaurants on a Saturday
afternoon at 1:00 p.m.  In all candor, the court believes that
the Debtor has asked BOA and this court to make a big leap of
faith here.  For the reasons stated more fully below, the court
will not take that leap of faith, and does not believe BOA should
be forced to do so.

16.  Finally, in addition to the environmental issues (which
for the most part remain a question-mark of sorts), and the other
value concerns already discussed, BOA is worried about certain
restrictions in the proposed transaction-documentation with the
City of Farmers Branch (which the court alluded to earlier) that
contemplate that the Debtor and any successor-transferee on the
proposed swap land could lose the proposed swap land to the City
of Farmers Branch if the land is not being utilized for an
acceptable purpose in 20 years.  But to be clear, in addition to
the environmental unknowns, BOA is most concerned that the
proposed swap land is simply not as valuable and marketable as

-17-

simply keeping the Eagle Crest Property intact.  The available land in the nearby vicinity of the proposed swap land is plentiful and arguably more desirable to any likely purchaser than the proposed swap property.  Meanwhile, swapping the surplus land, BOA believes, impairs the marketability and value of the Eagle Crest Property overall.

## <u>CONCLUSIONS OF LAW</u>

A.  The Section 363 Motion presents a mixed question of fact and law.  First, there is a legal question of whether it is even permissible, pursuant to Section 363, for the Debtor to propose a "swap" or "exchange" of a portion of property of the estate (that is subject to a lien) for other non-estate property, and for the court to approve such.

B.  As the court indicated earlier, the Debtor has proposed a novel and interesting strategy here.  Courts have held that Debtors, **in the context of a Chapter 11 plan**, may provide replacement collateral to a secured lender.[2]  That is, essentially, what the Debtor is proposing here—**except not in a plan**.  If the Debtor were in a plan context, Section 1123(a)(5)(B) of the Bankruptcy Code would provide for the possibility of part of property of the estate being **transferred** to another entity pursuant to the plan and, also, Section

---

[2] And, certainly, in a usage of cash collateral context (Section 363(c)), replacement collateral to a lienholder is often proposed and approved.

1123(b)(5) would provide for the possibility that the rights of the secured lender might be *modified* pursuant to the plan. So, combining these sections, it appears to this court that the Debtor could provide for this type of swap in a plan, and the secured creditor could vote yes or no on the plan, and if it voted no, then under Section 1129(b) of the Bankruptcy Code, the court would consider whether to cram the plan down over the secured lender's objection, pursuant to Section 1129(b)(2)(A) of the Bankruptcy Code. It appears that this would, then, involve the court examining whether the secured lender would realize the indubitable equivalent of its secured claim in the overall transaction. This would involve examining both *value and risks* associated with the transferred and replacement property.

C. But, again, the context of this case is not plan-confirmation. The Debtor is attempting to utilize Section 363 to accomplish the proposed swap of part of BOA's collateral. Under Section 363(f), a debtor-in-possession may *sell* property of the estate free and clear of interests under certain scenarios. One such scenario is when the interest involved is a lien, and the price at which a property is to be sold is greater than the aggregate liens against the property. 11 U.S.C. § 363(f)(3). Thus, arguably, Section 363 could provide legal authority for the proposed land swap here—but *only* if the court deems the *swap* (*i.e.,* the land-for-land exchange) to be, in essence, a "sale,"

and only if the value that the Debtor would be obtaining (*i.e.,* the value of the swap land) is greater than the liens on the surplus property.

D. The word "sale" is not defined in the Bankruptcy Code. The word "transfer," on the other hand, **is** defined in the Bankruptcy Code. "Transfer" is defined at Section 101(54) as, among other things, any mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property, and also would include a creation of a lien, the retention of title as a security interest, and a foreclosure. It would appear to the court that a "transfer" would certainly **include** a "sale," but a "transfer" is **not** always necessarily going to be a "sale," as contemplated by Section 363 (such as with a "swap" or "exchange"—such as is proposed by the Debtor in the case at bar). But even if the land swap **is** tantamount to a sale (*i.e.,* even if the Debtor can propose this land swap outside the context of a plan, pursuant to Section 363), Section 363(e) must be consulted, and Section 363(e) prohibits a debtor-in-possession from using, selling, or leasing property in which an entity has an interest without providing some sort of adequate protection with regard to such interest. Then, if one looks at Section 361 of the Bankruptcy Code, it gives a laundry list of what might constitute "adequate protection." Among the list of what might constitute adequate

protection is periodic cash payments in some appropriate amount, replacement liens or additional liens, or something else that *might result in the realization of the indubitable equivalent of the entity's interest in the property being sold, used or leased*. Once again, this involves looking at *value and risk*—similar to the plan context described earlier.

E.   Here, the court holds that the Debtor ultimately cannot prevail on the sale or "swap" motion before the court.  First, the court has not been presented with any authority that convinces it that the proposed transaction is, indeed, a "*sale*" that might be accomplished under Section 363, versus a "*transfer*" that might be accomplished under Sections 1123 and 1129.  But even if Section 363 technically *does* authorize this type of swap transaction, as tantamount to a "sale," the court cannot find that BOA is adequately protected (as contemplated by Section 363(e) and Section 361) with what has been proposed.  The transaction does not pass muster from a *value and risk* standpoint.

F.   With respect to the risks, they are, frankly, potentially very real, in the court's estimation, based on the credible evidence, at this juncture.  The court, in all candor, found Mr. Hemingway and Mr. Blatt more credible and convincing than the Debtor's experts.  And the court, quite candidly, believes that the Debtor has not done the due diligence that it

should have done to exercise reasonable business judgment and propose the swap. Specifically, the evidence was that the City of Farmers Branch approached the Debtor about the proposed land swap approximately a year and one half ago. And yet at the start of this hearing, the Debtor had not undertaken a Phase I environmental study on the proposed swap land or the adjacent former landfill. It did undertake a Phase I during the weeks that the three-day hearing took place in this matter. The testimony was that a Phase II study might cost around $65,000. The court believes that a Phase II study would have been reasonable under the circumstances of this proposed land-swap, and was not an unreasonable price to pay, if the Debtor genuinely believes the proposed swap property may be worth $1,600,000. Additionally, the court is very concerned that the Debtor's representative, Mr. Shelley, testified that Prime was not by any means getting a windfall on the 20-acre former landfill it would be conveyed, because it would likely have to pay $3,000,000-$4,000,000 to excavate waste from the 20-acre former landfill. This testimony seemed not just speculative, but not credible if waste was, indeed, removed from the former landfill in 2007 (which other evidence showed). At a minimum, Mr. Shelley seemed very fuzzy on the facts as to the proposed swap land and the landfill, and that was not very comforting (when evaluating the Debtor's business judgment).

G. With respect to value, valuation is a challenge. The

proposed swap land (and the adjacent 20-acre former landfill) have never been marketed to the public. But again, the court found the evidence of Mr. Blatt more compelling on this issue—specifically, that industrial or warehouse usage seemed more likely than retail, due to: (a) the unknowns of the former adjacent landfill, (b) low residential population, (c) lack of visibility of the property from the President George Bush Turnpike, (d) much available land nearby, and more desirable available land nearby, and (e) lack of development generally in the area at this juncture—not to mention the approximately $500K tax valuation. The court accepts Mr. Blatt's valuation as the more credible of the two appraisers–based on the evidence presented.

<u>**CONCLUSION**</u>

For all of the reasons stated, the Section 363 Motion is denied. The court concludes that Section 363 does not permit the proposed transaction. Moreover, even if it did, the credible evidence regarding risks and value do not support the swap being an exercise of reasonable business judgment. Finally, the court does not find that the proposed transaction would provide the necessary adequate protection to BOA because the replacement lien it would be receiving would not be the indubitable equivalent of its existing lien that it would be giving up.

Additionally, the Motion to Lift Stay of BOA is denied,

*conditional on certain adequate protection being offered and other relief being afforded to BOA*. Specifically, the court finds that BOA is undersecured, but only slightly. Yet the court cannot find that the Eagle Crest Property is not necessary to an effective reorganization. The fact is, that the Eagle Crest Property is a source of significant monthly cash flow at this juncture (more than BOA's monthly debt service) and it appears to the court that there may be opportunities for the Debtor to maximize value for all concerned with respect to this property. Moreover, as alluded to above, the Debtor has the ability to pay BOA significant monetary adequate protection from the cash flow on this property. Further, the court is not convinced that the Debtor has acted in bad faith due to the transfer of the Eagle Crest Property from Transcontinental Brewery, Inc. to the Debtor on the eve of bankruptcy. While the court is troubled that the Debtor chose to breach its loan documents in that manner, the Debtor has been 100% candid about the transfer and credibly testified as to a business justification that is not entirely farfetched–*i.e.,* saving costs with one bankruptcy case instead of four, and, more importantly, *using equity from certain properties to perhaps enhance reorganization prospects with regard to other low-equity or no-equity properties*. And with respect to the demolition of the warehouse on the Eagle Crest Property, this was, the court believes, to some extent a miscommunication and it

seems it was more of an effort, on the part of the Debtor's representatives, to enhance marketability—in their minds—rather than detract from collateral value.

The court, based on all the facts and circumstances, will deny the Motion to Lift Stay and continue the stay conditional on the following:  (a) henceforth, the Debtor shall pay BOA, on a monthly basis, the lesser of $20,000 per month or monthly contractual interest at the non-default contract rate on the BOA loan (or the stay shall lift); (b) second, the stay will lift June 1, 2011 as to BOA to pursue its state law remedies if there is no confirmed plan in this case by then; (c) the Debtor will continue to maintain insurance on the Eagle Crest Property and continue with reporting requirements in this case; and (d) any plan in this case that might ultimately re-urge a swap of land, such as was proposed in the Section 363 Motion that has been herein denied, will *not* be considered by this court unless (i) a Phase II environmental study has been undertaken that shows an acceptable risk with regard to the swap land (performed by Mr. Hemingway); and (ii) some sort of *additional* consideration is proposed to BOA as part of such swap transaction, other than simply a lien in the swap land (such as a significant cash pay down to BOA, other meaningful collateral, or something that otherwise provides BOA with the indubitable equivalent of its secured claim).  In other words, in making this ruling on the

BOA Motion to Lift Stay, the court is giving the Debtor a brief window of opportunity in this Chapter 11 case. The Debtor may retain the Eagle Crest Property until June 1, 2011—conditional on paying more monetary adequate protection to BOA and conditional on getting a plan confirmed by such date. The court has hopefully given herein some parameters on what might be confirmable.

THE PARTIES ARE DIRECTED TO SUBMIT ORDERS ON THE SECTION 363 MOTION AND MOTION TO LIFT STAY CONSISTENT HEREWITH.

# # # END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW # # #