

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

**Signed June 16, 2011**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE: §
 § CASE NO. 10-37054-SGJ-11
EQK BRIDGEVIEW PLAZA, INC., §
 § CHAPTER 11
 DEBTOR. §

**FINDINGS OF FACT, CONCLUSIONS OF LAW
AND ORDER ON MOTIONS FOR RELIEF FROM AUTOMATIC STAY
[DE ## 13, 228 & 275]**

CAME ON FOR CONSIDERATION by the court, in a combined evidentiary hearing held June 10, 2011: (a) the Motion for Relief from the Automatic Stay [DE ## 13 & 228] filed by Grand Pacific Finance Corp. ("Movant-GP"), pertaining to certain real property sometimes referred to as the "Dunes Plaza Property" (the "Dunes Plaza Motion"); and (b) the Motion for Relief from the Automatic Stay [DE # 275] filed by Wells Fargo Bank, N.A., as Indenture Trustee for the Grand Pacific Business Loan Trust 2005-1 ("Movant-Wells" and, collectively with Movant-GP, the "Movants"), pertaining to certain real property sometimes referred to as the "Bridgeview Plaza Property" (the "Bridgeview

Plaza Motion") (collectively, the "Motions"). The above-referenced Chapter 11 debtor, EQK Bridgeview Plaza, Inc., will henceforth be referred to as the "Debtor." The following are the court's findings of fact and conclusions of law pertaining to the Motions. Where appropriate, a finding of fact shall be construed as a conclusion of law, and *vice versa*. The court has jurisdiction over these contested matters, pursuant to 28 U.S.C. § 1334, and these are core proceedings, pursuant to 28 U.S.C. § 157(b). The most pertinent statutory authority is Section 362 of the Bankruptcy Code. The court reserves the right to supplement or amend these findings of fact and conclusions of law.

## **FINDINGS OF FACT**

1. The Debtor filed its voluntary Chapter 11 bankruptcy case on October 4, 2010. The Debtor represents that it now owns four separate pieces of real property, which the Debtor's Schedules valued, collectively, at $74,312,000:

   (a) **Windmill Farms** (which is approximately 2,928 acres of undeveloped land in Forney, Texas), which property was allegedly acquired by the Debtor from a related entity called "EQK Windmill Farms, LLC" shortly before filing bankruptcy (with the Debtor assuming all debt of EQK Windmill Farms, LLC);

   (b) **the Dunes Plaza Property** (which is a shopping center in Michigan City, Indiana), which property was also allegedly acquired by the Debtor shortly before filing bankruptcy from a related entity called South Cochran Corporation (with the Debtor assuming all debt of South Cochran Corporation);

   (c) **the Bridgeview Plaza Property** (which is a shopping center in LaCrosse, Wisconsin), which property-unlike

-2-

the other real properties–the Debtor has owned for several years (and the Debtor has been obligated on the secured debt against the Bridgeview Plaza Property for many years); and

(d) **Eagle Crest Property** (which is an office building, and the site of a former warehouse and approximately 12 acres in Farmers Branch, Texas), which property the Debtor allegedly acquired from a related entity called Transcontinental Brewery, Inc., n/k/a 1925 Valley View, Inc., shortly before filing bankruptcy (with the Debtor assuming all debt of Transcontinental Brewery, Inc.).

2. As noted above, the Debtor (and/or its equity owners) essentially orchestrated an eve-of-bankruptcy "roll up" (for lack of a better term). In other words, three of the four real properties listed in the Debtor's Schedules were allegedly transferred *to the Debtor* from other, related entities just days before the Chapter 11 filing (along with all associated debt). The Debtor has not concealed these facts (postpetition) at all, but, rather, has taken the position that there was a *valid business purpose* for the transfers—that being to both save costs and streamline the process with respect to the Chapter 11 filing (*i.e.,* by having one case instead of four), and, also, to enhance the reorganization prospects of certain properties that have minimal or no equity, by essentially pooling such assets with properties that *do* have equity. For example, the Windmill Farms property is believed to have substantial equity (perhaps $30 million, by the Debtor's estimate), but it is as-yet undeveloped and yields no cash flow. No party has ever prosecuted a motion to dismiss this case under Section 1112 of the Bankruptcy Code

(under a classic "bad faith filing" or "new debtor syndrome" type of theory).  Sophisticated lenders are involved in this case, and likely they recognized that there were complexities here–perhaps there were some bona fide grounds for and benefits to the "roll up" strategy.  While no motion to dismiss was ever prosecuted, the case has nevertheless been very contentious.  Significant adequate protection has been paid to lenders and cash collateral usage has been tight.  Various sale and lease motions have been vigorously opposed.

    3.    While the Debtor's strategy for this case has always been articulated as one aimed at maximizing recoveries to all, through the pooling of these four real estate assets, the court recently lifted the automatic stay as to the lender on one of the Debtor's three properties (the Eagle Crest Property).  Thus, this property will no longer potentially be a part of the Debtor's pooling/value-maximization strategy (absent an unexpected agreement between the Debtor and the Eagle Crest Property-lender).  The court has also earlier declined to approve one disclosure statement filed by the Debtor in this case (at the urging of all of the Debtor's secured lenders), for the reason that the plan which it accompanied seemed patently unconfirmable.

    4.    On the night before the hearing on the Dunes Plaza Motion and the Bridgeview Plaza Motion that are now before the court, the Debtor filed a new plan.  The new plan proposes the Debtor's retention of at least two of the real properties (*i.e.,*

the Windmill Farms Property and the Bridgeview Plaza Property). As to the Dunes Plaza Property, the secured lender thereon would have various options, including the option to take back the property, along with 14 adjacent acres being contributed by an affiliate of the Debtor (who is a guarantor), and this would be consideration for all amounts owed to the Dunes Plaza Property-lender. An insider of the Debtor (once again, a guarantor on the loans from Movant-GP and Movant-Wells) would commit a certain amount of funds to the proposed new plan. The Debtor's new plan offers the Bridgeview Plaza Property-lender interest, only, at 4.75%, on its allowed secured claim (for a term of up to 60 months, with the property to be sold or refinanced within 60 months). The Debtor's new plan offers the secured lender on the Windmill Farms Property interest payments that would escalate over time from 3.25% to 5%, with the intention being to sell this property in stages (or in lots/acreage increments), over a 3-5 year period, with a set per-acreage release price, and other creditors of the Debtor would be paid down on their claims from any sales' proceeds exceeding the release price. Right now, the Debtor hopes to have support on its new plan of at least the lender on the Windmill Farms Property. But no lender, including the Windmill Farms Property-lender, at this juncture, has expressed support for the Debtor's new plan.

5. The Debtor believes, in the event that no lender supports its new plan, that it would at least have one impaired,

accepting class to go to "cramdown"—that being a class consisting of a secured property tax claim of a governmental unit (there actually may even be more than one of these classes consisting of a secured property tax claim). At this juncture, the court does not have before it the question of whether a secured tax claim (in respect of property taxes) can constitute an "impaired, accepting class" so that a plan proponent can seek cramdown of a plan under Section 1129(b) of the Bankruptcy Code. *See*, in tandem, Sections 1123(a)(1), 507(a)(8) and 1129(a)(9)(D) of the Bankruptcy Code. While a plan proponent shall "classify" such a secured tax claim, unlike in the case of a priority **unsecured** tax claim (*see* Section 1123(a)(1) of the Bankruptcy Code-which only carves out from classification unsecured priority tax claims pursuant to Section 507(a)(8) of the Bankruptcy Code), this court struggles with whether it is proper to treat a class consisting of secured tax claim(s) as an "impaired, accepting class," **assuming such claims are receiving the treatment statutorily prescribed by Section 1129(a)(9)(D) of the Bankruptcy Code**. Why? Because the tax claimants cannot **object** to such treatment allowed by Section 1129(a)(9)(D) of the Bankruptcy Code-so why should their "**acceptance**" be relevant? The answer may have been different pre-BAPCPA when secured tax claims were not addressed

in Section 1129(a)(9)(D) of the Bankruptcy Code.[1] *But see In re Greenwood Point, L.P.*, 445 B.R. 885 (Bankr. S.D. Ind. 2011) (treating a class consisting of a secured tax claim as an impaired, accepting class).

6. In any event, this is now an eight-month-old case. There is still an unfortunate lack of any consensus among the Debtor and its major creditor constituencies and still looming legal challenges that could be waged at a confirmation hearing. Certain secured lenders argue that the Debtor's (or its equity owner's) "roll up", of four distinct borrowers into one entity on the eve of bankruptcy (as described in paragraphs 1 and 2 above) may pose a problem getting a plan confirmed under various theories (*e.g.,* Section 1129(a)(3) of the Bankruptcy Code-good faith-in that the lenders did not consent to a different obligor on their notes and had the expectation that a single-purpose vehicle would be their borrower, rather than a consolidated entity with multiple creditors and multiple assets). Such lenders argue now that the "roll up" was an *ultra vires* corporate act and the Debtor does not validly **own** all the four properties that it purports to own. They further argue that the Debtor's "roll up" has essentially circumvented the single-asset real estate debtor

---

[1] The answer might also be different if the secured tax claimant were offered treatment **worse** than Section 1129(a)(9)-to which the taxing authority agreed. This would seem to be impairment for which acceptance **would matter**. Of course, artificial impairment is always a possible consideration, too.

provisions of Section 362(d)(3) of the Bankruptcy Code. They argue that the Debtor ought not to be able to cram down a plan against a lender with an impaired accepting class of creditors who were originally creditors of a different borrower, *etc.* Clearly, absent a negotiated settlement, confirmation is not going to be an easy road for the Debtor or a simple analysis for the court.

7. In any event, it is, again, the Dunes Plaza Property and the Bridgeview Plaza Property which are now the subject of the two pending Motions.

8. With regard to the Dunes Plaza Property, there is no dispute that Movant-GP has a valid perfected lien in it and that the Debtor has no equity in the property. The Debtor scheduled the property as having a value of $2,200,000 as of the October 4, 2010 Petition Date, and no party put on any valuation testimony to the contrary at the June 10, 2011 hearing. The Debtor owes Movant-GP $3,587,118.63, in connection with a promissory note dated January 12, 2005 and security documents, and, again, such indebtedness is validly secured by the Dunes Plaza Property. *See* Movants' Exs. A, B, and F.[2]

9. With regard to the Bridgeview Plaza Property, the court

---

[2] The Dunes Plaza Property was placed under the custody of a state court receiver shortly before the bankruptcy filing (summer 2010). Movants' Ex. D. The parties agreed and the bankruptcy court has allowed the receiver to remain in place postpetition collecting the rents from the Dunes Plaza Property.

heard credible testimony from a testifying expert, Mr. Randal Dawson of CB Richard Ellis, that the property is worth $6.3 million. The appraisal that Mr. Dawson performed was dated April 1, 2010. While somewhat dated, there was no evidence suggesting that the value may have changed since that date, so the court accepts this as the current value of Bridgeview Plaza Property. Movant-Wells asserts that it is currently owed $6,790,432.46 by the Debtor, which amount is secured by the Bridgeview Plaza Property, pursuant to a promissory note dated March 31, 2005, and a mortgage, security agreement and fixture financing statement. *See* Movant-Wells Exs. I, J. and Affidavit of Louise Varsos [DE # 284]. Thus, Movant-Wells asserts that the Debtor has no equity in the Bridgeview Plaza Property. The Debtor does not dispute the secured status of Movant-Wells but disputes Movant-Wells' computation of its indebtedness and application of certain adequate protection payments it has received postpetition. The Debtor believes that Movant-Wells is owed approximately $6,256,000 and, thus, the Debtor believes that it has a slight amount of equity in the property. Even if the Debtor's computation is right, the Debtor, in fact, has no equity in the Bridgeview Plaza Property because more than $200,000 of secured tax liability encumbers the property. Thus, the court finds that the Debtor has no equity in the property (regardless of whether Movant-Wells' computation is correct or the Debtor's computation

is correct).

10. In summary, the Debtor has no equity in the two properties that are subject to the Motions. The question, thus, becomes whether the properties are necessary to a reorganization that is in prospect (rather than a reorganization scheme grounded in mere unsubstantiated hopes). 11 U.S.C. § 362(d)(2)(B). *See United Sav. Assoc. of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 371 (5th Cir. 1987), *aff'd*, 484 U.S. 365 (1988):

> We recognize that relief from the stay hearings are usually held early in the case and that they are expedited, limited in scope, and held on limited notice. Therefore, the bankruptcy court applies the "reasonable possibility of successful reorganization" standard with somewhat more indulgence than would be appropriate if the motion were made at a later stage in the proceedings or if a similar issue were raised in the contexts of a full-blown hearing that attends a motion to dismiss or convert the case brought under Section 1112. Nonetheless, the "effective reorganization" standard must be given meaning by the bankruptcy court. To prevail against a secured creditor who has moved to lift the stay under Section 362(d)(2), the debtor must do more than evince high hopes; he must be able to show a reasonable prospect for a successful reorganization within a reasonable time.

11. An alternative question is whether there is more general "cause" to lift the stay, due to the prepetition activities of the Debtor. 11 U.S.C. § 362(d)(1). What prepetition activities of the Debtor? The Movants argue that the prepetition "roll up" described above is bad faith. Movant-GP also argues that the "roll up" as to the Dunes Plaza Property is particularly bad faith since there was a receivership order in

-10-

place (at the time of the "roll up") prohibiting any transfer of the Dunes Plaza Property. *See* Movants' Ex. D. With regard to the latter point, the Debtor's representative (and a lawyer who orchestrated the "roll ups") testified that they were not aware they would be violating the receivership order when they executed the "roll ups." This testimony seemed rather questionable and suspect to the court. However, arguably, the Debtor went a long way to purging any bad faith conduct here by agreeing, postpetition, that the receiver could remain in possession and control of the Dunes Plaza Property postpetition, pending a possible confirmation of a plan. *See* 11 U.S.C. § 543(d).

## CONCLUSIONS OF LAW

A. The court concludes that the "roll up" here was not *per se* bad faith. In any situation such as this, the analysis is very fact-intensive. Here, the Debtor never hid anything postpetition. The Debtor had valid business justifications for the "roll up" that it articulated early in the case. The Debtor had a possible pooling/value-maximization strategy for the Chapter 11 case. While breach of loan documents and breach of corporate charters is surely implicated here (and is problematic)–***and while surely such a "roll up" strategy can be a recipe for a contentious and expensive case, if lenders are not***

***consulted and do not agree to the strategy from the get-go***—[3]the court has not been presented thus far with any argument that any law has been violated, and the court remains unconvinced that there was patently bad faith at play.

  B. So this, as presented, is not "cause" to lift the stay.

  C. However, the court has grave concerns whether the Debtor is going to be able to confirm a plan here, absent lender consent.  In other words, the court has concerns whether an effective reorganization is in prospect.  While the court is not deciding today whether a secured tax claim can constitute an impaired accepting class for cramdown purposes (the exact issue is not yet before the court), the court has herein made known its doubts regarding this.  Moreover, if a lender as to one property (*e.g.* Windmill Farms) accepts the Debtor's plan, and it is the one and only impaired accepting class, can ***it*** be used as an impaired accepting class to cram down other lenders (who dealt with different borrowers)?  On the one hand, one cannot ignore the significance of the fact that the lenders bargained with and loaned money to ***different borrowers*** originally.  On the other hand, Section 1123 of the Bankruptcy Code permits mergers and consolidations, transfers of property, and modification of

---

[3] In fact, here, at the end of the day, the goal of streamlining and saving costs has no doubt not been achieved, by rolling up assets and liabilities into one debtor, because of the lack of trust that the action has engendered in the secured lenders and the resulting contentiousness in the case.

secured claimants' rights. As alluded to earlier, the issues here are thorny. The court cannot and will not deal in hypotheticals at this juncture and cannot find that there is no reasonable possibility of a reorganization in prospect. However, the case has gone on for a long time and the court will not tolerate delays much longer.

D.  For all of the above reasons, the court concludes that it is appropriate at this juncture to deny the Motions, but denial is *conditional on the following:*

*1.  The Debtor shall continue to provide monetary adequate protection to the Movants as previously ordered.*

*2.  The automatic stay in this case as to Movant-GP and Movant-Wells shall lift on <u>August 31, 2011</u> if the Debtor has not obtained confirmation of a plan by such date.  <u>The court will allow no more than a one-day hearing for a confirmation hearing in this matter</u>.*

# # # END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND ORDER # # #